## Perkins' Estate

Before Lamorelle, P. J., and Gest, Henderson, Van Dusen, Stearne and Sinkler, JJ.

The facts appear from the adjudication of

STEARNE, J., Auditing Judge.—This trust arose under a deed of trust dated March 5, 1910, made by the settlor, wherein and whereby certain securities, as listed in a schedule attached thereto, were transferred and delivered to Trust Company of North America and Joseph S. Clark, as trustees, in trust to hold the same and pay the net income therefrom to Arthur Clark Denniston for his life, subject to certain spendthrift provisions as noted in the second paragraph thereof, and after his death the principal to be distributed as he might by will appoint, and, in default of such appointment, then to such of his nieces as might be living at the time of his death, share and share alike. It was further provided that in case of the trusteeship becoming vacant, by reason of the resignation of either of the trustees or otherwise, then a successor was to be appointed by an instrument in writing executed by the remaining trustee and the said Arthur Clark Denniston.

Trust Company of North America having ceased to function, under the rights and powers conferred by the deed Bank of North America and Trust Company was substituted in its place and stead. This latter institution later merged with The Pennsylvania Company for Insurances on Lives and Granting Annuities, the present accountant. Joseph S. Clark, the individual trustee named in the deed, survives, and he is also one of the present accountants.

The life tenant of the trust, Arthur C. Denniston, died on January 31, 1932, leaving a will dated December 18, 1930, which was duly probated in New York, whereby he exercised the power of appointment given him under the deed by giving the trust estate to his trustees (the same as those now acting under the deed of trust), in trust to pay over the net income therefrom to his wife, Leal Mary Denniston, for her life, together with such amounts of the principal thereof as she might from time to time request, not to exceed a total of $75,000, with remainder, as to any principal not thus consumed by her, as his said wife might by will appoint, or, in default of such appointment, then to Ora L. Edmunds, William Morley Edmunds and Leal R. Edmunds.

The reason or purpose of the filing of the account is that Arthur C. Denniston, the life tenant under the deed of trust, died on January 31, 1932, as aforesaid, and it is necessary that certain questions in connection with the administration of the trust be adjudicated at this time.

An application is made by the appointees of the life tenant, who had a general power of appointment, to surcharge the trustees for loss occasioned by unwise and improvident investments of the trust res. The legal principle involved is whether the trustees, in such case, are liable to surcharge, where such investments are made at the insistence of the life tenant, especially where such demands are actively joined in by the chief appointee of the life tenant. Put concisely, are not the appointees of the life tenant with a general power of appointment estopped from seeking a surcharge following a loss through unwise investments, where such a life tenant himself induces the trustees to make the investments, and it is joined in by his chief appointee? Should the parties induce the investments and then obtain a surcharge because the trustees comply with their demands?

The settlor placed these assets in the hands of her cousin and a trust company, as trustees, to pay to her brother the net income for his life (protecting the income by a spendthrift clause), and granted the brother a general testamentary power of appointment, which he thereafter duly exercised. By the terms of his appointment, the life tenant granted his wife a life estate, with right to consume principal to the extent of $75,000, with a general testamentary power of appointment as to the balance and a gift over in the event of her failure to so appoint.

The assets at the commencement of the trust had a stated value of approximately $87,000, and profits and accretions amounted to nearly $50,000. From 1910 until August 1927, a period of 17 years, the trust estate was orderly and profitably administered. In the summer of 1927, the life tenant and his wife were the owners of a piece of land in the Bronx, New York, where they conducted a camp for automobile tourists, and wherein they resided. Apparently the ground was also considered by the owners as an eventual land development enterprise. As the project became progressively more burdensome to carry, the life tenant and his wife persistently solicited the trustees for financial assistance. The trustees eventually acceded to their demands, and invested trust funds in mortgages secured upon the real estate. The trustees also expended approximately $40,000 in the erection of a home for the life tenant, which expenditure was secured by a mortgage. Second and sometimes third mortgages were accepted by the trustees as such investments.

Ultimately, the project and development becoming steadily worse, it was determined to exchange the equities in the camp for the equity in a Brooklyn apartment house. This involved the advancement of an additional $40,000, for which the trustees accepted a fourth mortgage, subject to prior encumbrances of $395,000. The apartment house was unsuccessful as a business enterprise

and was ultimately abandoned and the investment lost. Through these investments, the details of which are in the notes of testimony and need not be recited here, practically the entire trust estate has been consumed.

The widow of the life tenant (being his appointee for life, with right to consume principal to the extent of $75,000, and with general power of appointment over the balance as aforesaid), who joined with her husband in demanding that the investments be made, now objects to the same and seeks to surcharge the trustees for an amount in excess of $100,000. She claims that she was under the domination of her husband, was without business experience, and therefore should be excused from all liability for her participation. I decline so to find. Mrs. Denniston was a woman of culture and refinement, a college graduate and, from a reading of her correspondence and the testimony, I find that she was a leader rather than a follower in the demands for these investments.

There cannot be the slightest question that in an ordinary trust estate, with the rights of life tenant and remaindermen to be protected, investments as herein made would be absolutely indefensible. Unless the trustees are shielded by legal principles because of the provisions of this trust, there is unquestionably a liability for the full amount of the investments. Not only was the security for the advancements inadequate, but the trustees, under the evidence, failed to use ordinary business care and acumen in making the investments.

The reason assigned by the trustees for making these extraordinary investments was that they considered the life tenant, so possessed of an unlimited general power of appointment, as tantamount to a sole owner of the trust res. While they could not distribute the trust res to him in his lifetime, yet, as he controlled the disposition of the principal at his death, they considered themselves as possessing unusual latitude in acceding to his demands, especially where he was manifestly joined in them by his wife. In fact, as the trustees became more deeply involved in such financing, the life tenant agreed to appoint the estate to his wife, as to all of which she agreed in writing. This agreement, in fact, he did perform.

After careful consideration, I have concluded that the trustees are not liable and should not be surcharged. In my opinion, the life tenant and his appointee wife are estopped from seeking to surcharge the trustees for making the improvident investments which they themselves so earnestly urged and induced the trustees to make.

A life tenant with a general power of appointment has an estate tantamount to a fee. See Lyon et al. v. Alexander, 304 Pa. 288, where Mr. Justice Schaffer said, at page 291: "No one has any interest in a general power of appointment except the donee of the power. The donee could appoint to any one, to her own estate if she pleased." At page 292: "the testator . . . has placed it for all practical purposes as completely within the control of the donee of the power as though a fee had been created in him." Again at page 292: "If the donee of a general power may appoint to his own estate or to anyone in the world, no individual is wronged by what he may do, and, therefore, no individual can complain".

In Clermontel's Estate, 12 Phila. 139, 141, Judge Ashman wrote:

"The legatees who now make complaint, take under the will of Joseph Fleming, but only by virtue of the power of appointment exercised in their favor by the present testatrix. They are absolute strangers to the original estate, and owe their interest therein solely to the bounty of the donee of the power. The latter, by her own acts in her lifetime, was estopped from complaining of the action of the accountant, and it is monstrous to assume a greater privilege for her beneficiaries. In objecting to these investments, they will, if successful,

enlarge the estate which they derive from the bounty of the testatrix by discrediting her acts in connection with that estate."

The facts in the present case are stronger than in Clermontel's Estate. Here the appointee actively participated in inducing the investments which she now seeks to repudiate to her own gain.

In this connection see also Welsh's Estate, 22 Dist. R. 401, and Curran's Estate, 17 D. & C. 435, 443, 446. Curran's Estate was affirmed by the Supreme Court in 312 Pa. 416, in an opinion in which it was said, in part: "Certainly if, in the circumstances, with full knowledge of the facts and of her rights, Mrs. Curran was content, her appointees will not be heard to complain."

I rule therefore that, since Arthur C. Denniston did not, and, in fact, could not have had the trustees surcharged in his lifetime, his appointee widow is accordingly now estopped from seeking such surcharge against the trustees.

Likewise the contingent legatees under the will of Arthur C. Denniston (who take upon the failure of his widow and appointee to exercise her power of appointment) are in the same situation. These legatees owe their interest, not to the settlor, but to the life tenant through his power of absolute appointment. As he is or was estopped, so are those who claim through him. I rule that such legatees are without interest or equity as a basis for complaint.

Much reliance is placed upon the existence of a spendthrift clause in the deed. Argument is made that the trustees, in point of fact, really paid or distributed a substantial amount of the corpus of the trust estate to the life tenant. This is not the fact. However unwise or improvident the investments, nevertheless for all advancements the trustees took back obligations for repayment. Title and ownership in such securities always was, and still remains, in the names of the trustees. The life tenant, at no time, ever received anything except income. This is a very different case from that in which principal is paid out to a life tenant protected by a spendthrift clause: Stambaugh's Estate, 135 Pa. 585. The cases which decide that the existence of a spendthrift clause prevents the termination of the trust, even by acquiescence of all parties: Rehr v. Fidelity-Philadelphia Trust Company, 310 Pa. 301; have no application. The parties did not seek to terminate the trust. The beneficial owner demanded, for his own benefit, investments of the character made. Perhaps they were most unwise, but under no circumstances can they be deemed distribution to the life tenant himself.

The remaining proposition is this: The spendthrift provision evidences an intent on the part of the settlor that the life tenant was to have no control over the principal; the existence of such a clause precludes the cestui que trust from insisting upon investments whereby he is liable to lose everything; this is the very purpose of such a provision; and notwithstanding his insistence and that of his wife the trustees should have been adamant and declined to accede to their demands. However, the clause in question merely related to income and the life tenant was given an absolute power of appointment. No one except he (subject to the restriction of the spendthrift clause) had any interest or rights in the trust res.

Perhaps this is an extreme case, but I am persuaded that, despite the unwise and improvident character of these investments, they were made at the insistence of the life tenant, who was possessed of a general testamentary power of appointment, and were joined in by his wife and appointee. It appeals to me as being most unfair and unjust to permit a person to induce the making of investments—however unwise—and then to permit him, or any person or persons claiming through or under him, to repudiate such investments and to benefit thereby. I accordingly decline to surcharge the accountants.

*Clarence L. Mitchell,* for exceptants; *Raymond M. Remick,* contra.

Van Dusen, J., October 27, 1933.—The principle involved in this case is well summed up by the auditing judge when he says that it is "unfair and unjust to permit a person to induce the making of investments—however unwise—and then to permit him, or any person or persons claiming through or under him, to repudiate such investments and to benefit thereby." The authorities cited amply sustain this conclusion. See also Linnard's Estate, 16 D. & C. 143, 148, and Curran's Estate, 312 Pa. 416, 423, 424.

The exceptions are dismissed and the adjudication is confirmed absolutely.